

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2008

# Yusupov v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 05-4232

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Yusupov v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1339.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1339

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 05-4232 & 05-5411
_____

BEKHZOD BAKHTIYAROVICH YUSUPOV

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

Respondent

_____

On Petition for Review of an Order of
The Board of Immigration Appeals
Immigration Judge:  Honorable Walter A. Durling
(No. A79-729-905)

_____

No. 06-3160

_____

ISMOIL SAMADOV

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES

Respondent

_____

On Petition for Review of an Order of
The Board of Immigration Appeals
Immigration Judge:  Honorable Grace A. Sease
(No. A79-729-711)

_____

Argued April 16, 2007

Before: McKEE and AMBRO, <u>Circuit Judges</u>
ACKERMAN,[*] <u>District Judge</u>

(Opinion filed:  March 27, 2008)

Lawrence H. Rudnick, Esquire (Argued)
Steel, Rudnick & Ruben
1608 Walnut Street, Suite 1500
Philadelphia, PA   19103

_____

[*]Honorable Harold A. Ackerman, Senior United States
District Judge for the District of New Jersey, sitting by
designation.

        Counsel for Petitioner,
        Bekhzod Bakhtiyarovich Yusupov

Paul A. Engelmayer, Esquire
Bassina Farbenblum, Esquire (Argued)
Wilmer Cutler Pickering Hale & Dorr
399 Park Avenue, 30th Floor
New York, NY  10022

        Counsel for Petitioner,
        Ismoil Samadov

Peter D. Keisler
   Assistant Attorney General, Civil Division
Michael P. Lindemann
   Assistant Director
Jonathan Potter, Esquire (Argued)
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC  20044

        Counsel for Respondent

---

OPINION OF THE COURT

---

3

AMBRO, Circuit Judge

An alien unlawfully in this country may have his removal blocked under certain circumstances. One is withholding of removal under Immigration and Nationality Act (INA) § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), which prohibits removal if the Attorney General believes that the alien's life or freedom would be threatened in the country of removal.[1] Eligibility for withholding of removal is erased, however, if "there are reasonable grounds to believe that the alien is a danger to the security of the United States." INA § 241(b)(3)(B)(iv), 8 U.S.C. § 1231(b)(3)(B)(iv). In this case we consider the Attorney General's interpretation of that

---

[1]This provision was added to the INA by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 419 (1999). It is sometimes referred to as mandatory withholding.

Regulations implementing the INA and the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT) also provide for withholding of removal. *See* 8 C.F.R. § 208.16(c). Like withholding of removal under the INA, withholding of removal under the CAT is unavailable to an alien to whom the national security exception applies. *Id.* § 208.16(d)(2). Because the question before us is the applicability of that exception, we need not distinguish here between withholding of removal under the CAT and the INA. Instead, we simply refer to that relief under either the INA or the CAT as "withholding of removal."

exception (commonly referred to as the national security exception).

In *In re A– H–*, 23 I. & N. Dec. 774, 788 (2005), the Attorney General construed the exception as referring to "any nontrivial level of danger" or "any nontrivial degree of risk." He further interpreted the provision to establish a "reasonable person standard," which he deemed to be "satisfied if there is information that would permit a reasonable person to believe that the alien may pose a danger to the national security." *Id.* at 789.

The Board of Immigration Appeals (BIA or the Board) relied on this interpretation[2] in the decisions under review here.[3]

---

[2]The current national security exception includes the phrase "reasonable grounds to believe," which differs from the phrase "reasonable grounds for regarding" that was at issue in *In re A–H–*. *See* 23 I. & N. Dec. at 787 (referring to "former section 243(h)(2)(D) of the Act"). The BIA treated these two formulations as identical for the purposes of these cases. No party argues that the formulations differ in a substantive way and we see no reason to treat them differently. *See also infra* Section IV.B.2 (discussing comparable language in the United States' international obligations toward refugees).

[3]Yusupov's case was heard by the U.S. Immigration Judge (IJ) Walter A. Durling. Samadov's case was heard by IJ Grace A. Sease.

5

It affirmed the determination that petitioners, two aliens from Uzkbekistan, were entitled to deferral of removal under the CAT because they faced likely persecution or torture if returned to that country.[4] It also concluded that the national security exception barred petitioners from withholding of removal.

Petitioners argue that we should reject the Attorney General's interpretation of the national security exception. For

Each IJ denied the respective asylum applications but granted deferral of removal (defined below). Judge Durling and Judge Sease differed in their holdings regarding the national security exception. Judge Durling held that Yusupov was entitled to mandatory withholding of removal. Judge Sease held that Samadov was barred from withholding of removal by the national security exception.

[4]The more limited remedy of deferral of removal under the CAT is unaffected by the national security exception. 8 C.F.R. § 208.17(a). An alien is entitled to deferral of removal if he is "more likely than not to be tortured" in the country of removal. *Id*. Deferral of removal will end upon a change in country conditions that makes it no longer more likely than not that the petitioner would be tortured in the country of removal. *Id.* § 208.17(d). The Attorney General also may terminate deferral of removal upon receipt of diplomatic assurances, forwarded by the Secretary of State, that the alien would not be tortured upon removal. *Id.* § 208.17(f).

For a history of the United States' adoption of the CAT, see *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 64 (3d Cir. 2007).

6

the exception to apply, they believe the danger must be current, it must be "serious" or "grave," and that this must be established by at least a probable cause standard.[5] The Attorney General responds that his interpretation of the exception is entitled to deference under the principles announced in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

We agree with the Attorney General on all points save one. The challenged interpretation ignores clear congressional intent to the extent that, instead of following the statutory language[6] and asking whether an alien "*is* a danger to the

---

[5]*See infra* Section IV.A.1 (discussing probable cause standard).

[6]The statute specifies four enumerated exceptions, preceded by an additional exception in its lead-in paragraph. The full text for the exceptions reads as follows:

> (3) Restriction on removal to a country where alien's life or freedom would be threatened
>> (A) In general
>> Notwithstanding paragraphs (1) and (2) [governing countries to which aliens ordered removed may be deported], the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country

because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

(B) Exception

Subparagraph (A) does not apply to an alien deportable under section 1227(a)(4)(D) of this title [stating that any alien who "[p]articipated in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing" is deportable] or if the Attorney General decides that–

> (i) the alien ordered, incited, assisted, or otherwise participated in the persecution of an individual because of the individual's race, religion, nationality, membership in a particular social group, or political opinion;
>
> (ii) the alien, having been convicted by a final judgment of a particularly serious crime[,] is a danger to the community of the United States;
>
> (iii) there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States before the alien arrived in the United States; or
>
> *(iv) there are reasonable grounds to believe that the alien is a danger to the security of the United States.*

8

security of the United States," it inquires whether an alien "*may* pose a danger to the national security" (emphasis added). Because we cannot discern from the record whether this error in the Attorney General's interpretation led to a result contrary to the intent of Congress in petitioners' cases, we remand for application of the correct standard.

## I.     Factual Background

---

For purposes of clause (ii), an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime. *For purposes of clause (iv), an alien who is described in section 1227(a)(4)(B) of this title [governing "terrorist activities"] shall be considered to be an alien with respect to whom there are reasonable grounds for regarding as a danger to the security of the United States*.

INA § 241(b)(3), 8 U.S.C. § 1231(b)(3) (emphases added).

Petitioners Bekhzod Bakhtiyarovich Yusupov and Ismoil Samadov are Uzbek nationals. They claim to be "independent Muslims" who attended the mosque of Imam Obidkhon Nazarov, whose followers, they assert, have been subject to continued persecution by the Uzbek government. Yusupov and Samadov stated that they left Uzbekistan to pursue educational opportunities in America but refused to return to their former country for fear of persecution.

Petitioners entered the United States separately in 1999 on F-1 student visas to learn English. With the exception of a four-week course in English attended by Samadov, petitioners did not attend educational institutions. Instead, despite lacking permission to work, they both found employment in Philadelphia, living together in a house with other Uzbek nationals, including Erkinjon Zakirov.

In 2002, agents from the Federal Bureau of Investigation (FBI) visited Yusupov and Samadov at their home. The agents asked questions about criminal charges asserted by the Uzbek government and received permission from them to search the house and the shared household computer. The FBI found no evidence of criminal activity on the premises, but took the computer for further analysis. A search of its hard drive revealed the following in the internet cache:

- a video-clip of a speech by Osama bin Laden in December 2001;

10

- a video-clip of a speech by Chechen militant Shamil Basayev;

- a video clip from November 2001, including a view of what appear to be Afghan fighters;

- video-clips of what appear to be attacks on Russian troops and vehicles;

- a publicly available state map showing locations of Pennsylvania State Police facilities; and

- an e-mail sent to Zakirov that read as follows:

    Your exit from there might bring some difficulties to the things we are taking care of here. Therefore, if you do not have very strong difficulties, for you to stay where you are and work for Islam is also a big *jihad*.[7]

---

[7]As petitioners acknowledge, *jihad* is commonly understood to mean "holy war." However, they have presented evidence that it can have alternative meanings, including "from an inward spiritual struggle to attain perfect faith to an outward material

11

Following the FBI's visit, Samadov was detained by the Immigration and Naturalization Service (INS) (predecessor to the Department of Homeland Security (DHS)) and served with a "notice to appear" for overstaying his visa. He was released on bond on the basis that he posed no danger to the community, the terms of which he followed.

In 2003, Yusupov moved to Virginia purportedly to get a higher-paying job. He worked as a school bus driver for a private Muslim grade school, where he was given access to a small storeroom with a mattress and an internet-enabled computer. He also obtained a job at a factory, falsely claiming to be a U.S. citizen on a federal Employment Eligibility Verification Form I–9. The Bureau of Immigration & Customs Enforcement (BICE) of DHS arrested him for making a false statement on a federal form, and seized a computer and his duffel bag from the school storeroom. BICE found some film containing pictures of the New York skyline and an intersection near the historic Fulton Ferry in the Brooklyn area of New York City, as well as cached pictures from the internet of violent activities in Central Asia. Yusupov pled guilty to making a false statement on the form and was sentenced to payment of a $100

---

struggle to promote justice and the Islamic social system." Brief of Samadov 50 (citing Encyclopedia of Politics and Religion 425–26 (Robert Wuthnow ed., 1998)). The weight, if any, that this evidence deserves and its relevance to petitioners' cases are questions for remand.

special assessment and probation. BICE also detained him and he entered removal proceedings.

In 2004, Samadov was detained again after the Uzbek government sent a notice of criminal charges[8] along with an extradition request[9] for him, Yusupov, and Zakirov.[10]

---

[8]Samadov testified at the IJ hearing that when FBI agents came to his house in June 2002 they informed him that the Uzbek Government had sent an earlier notice of criminal charges.

[9]The request specified that the criminal charges were brought under Article 244 of the Uzbek Criminal Code for alleged participation in "forbidden organizations." In response to the IJ's request, the U.S. State Department wrote a letter explaining that the Uzbek government has used its Criminal Code against political opponents for non-terrorism-related activities. In addition, Samadov testified that one of the four or five short-term boarders who had stayed with Yusupov and him in 2000—a person whose surname was Oripjanov—was also a follower of Imam Nazarov. Samadov stated that Oripjanov was arrested and tortured when he returned to Uzbekistan, and that he was forced to sign false accusations against Samadov, his other roommates, and other independent Muslims. Samadov claimed that Oripjanov initially offered to testify on Samadov's behalf but subsequently withdrew that offer.

[10]Zakirov was granted withholding of removal from the United States in 2004. *See In re Zakirov*, No. A 79-729-712, at

## II.    Removal Proceedings and Appeals to the BIA

### A.    Yusupov

Yusupov conceded that he was removable for violating the terms of his student visa, but applied for asylum, withholding of removal, and CAT relief. The IJ denied the asylum application as untimely. But he made a positive credibility determination, and concluded that Yusupov had established, on the basis of his support for Imam Nazarov, a clear probability of persecution sufficient for meeting the standard for withholding of removal.

The IJ also found that there were no reasonable grounds to believe that Yusupov was a danger to U.S. national security because he had engaged in no violent activities nor had he shown a propensity for doing so in several years of residence here, there was nothing to suggest that he espoused violence, the extradition request was likely a tool of persecution, and the

---

3 (BIA Dec. Sept. 21, 2004) (finding a "lack of persuasive evidence that the respondent is a militant, terrorist, or an extremist" and "a clear probability of persecution and torture upon [Zakirov's] return to Uzbekistan"). When asked at oral argument about Zakirov's whereabouts, given DHS Special Agent Mark W. Olexa's testimony that Zakirov "fled" to Canada, Samadov's counsel stated that he had not "fled to Canada" but instead "went to Canada" openly.

14

cached web-files pertained to world events near his home region that were of general interest and have become generally available to the public in recent years. *In re Yusupov*, No. A 79-729-905, at 5–8 (IJ Dec. Nov. 19, 2004). Accordingly, the IJ granted Yusupov's application for withholding of removal.

DHS appealed to the BIA, which dismissed Yusupov's appeal from the denial of asylum and reversed the IJ's determination that there were no reasonable grounds to believe that Yusupov was a danger to our Nation's security, thus making him ineligible for withholding of removal.[11] The Board emphasized that "the level of danger required under the statute need not be particularly high," and that DHS's evidence sufficed to meet this "relatively low burden of establishing 'reasonable grounds,'" namely: (1) the Uzbek extradition request and an Interpol warrant with allegations that Yusupov conspired with others to use violence, (2) the FBI's discovery of cached video files of speeches by bin Laden and others as well as of bombings in Chechnya, (3) the "*jihad*" e-mail sent to Yusupov's roommate Zakirov, (4) the fact that Yusupov entered the United States on

---

[11]In doing so, the Board employed the Attorney General's interpretation of the national security exception: "the reasonable grounds standard 'is satisfied if there is information that would permit a reasonable person to believe that the alien *may* pose a danger' to the security of this country." *In re Yusupov*, No. A 79-729-905, at 2 (BIA Dec. Aug. 26, 2005) (emphasis added) (quoting *In re A–H–*, 23 I. & N. Dec. at 789).

15

a student visa but never attended school, and (5) Yusupov's 2003 conviction for making a false statement on a federal form. *In re Yusupov*, No. A 79-729-905, at 2–3 (BIA Dec. Aug. 26, 2005). Nevertheless, the BIA agreed with the IJ's determination that Yusupov would face persecution and/or torture upon return to Uzbekistan, and thus granted the more limited remedy of deferral of removal under the CAT.[12]

---

[12]At oral argument, counsel for the Government represented that, until the Uzbek regime changes, the Attorney General would not accept any assurances that it will not torture petitioners. He also represented that, although unable to bind the State Department, the Attorney General was seeking a third country that would agree to take Yusupov and Samadov and was willing to discuss assurances from such countries for the safety of both petitioners. Samadov's counsel noted, in response, that litigation positions are not binding on the Attorney General, particularly if he is replaced. Indeed, the Attorney General has been replaced between the time of oral argument and the issuance of this decision.

So far as we understand, the Government has been unable to find a safe third country for either of the petitioners. *See Yusupov v. Lowe*, No. 06-1804, slip op. at 8 (M.D. Pa. Jan. 12, 2007). Reviewing Yusupov's *habeas* petition, the District Court ruled that Yusupov was entitled to immediate release, subject to the conditions of BICE-supervision, because the Government had detained him beyond the statutorily permitted 90-day period without establishing that the alien's removal would be effected in the reasonably foreseeable future and without establishing

16

**B.     Samadov**

Samadov also conceded removability and applied for asylum, withholding of removal, and CAT relief. The IJ denied his application for asylum as untimely, but granted withholding of removal under the INA on the basis of the finding that Samadov's testimony was "extremely credible" that, if removed to Uzbekistan, he would face persecution on account of his beliefs as an independent Muslim. The BIA affirmed in July 2004.

DHS moved the BIA to reopen in September 2004 on the ground that it had obtained new evidence that had been previously unavailable—namely, the e-mail mentioning "*jihad*" found during the 2002 FBI search of the computer's hard drive and an Interpol search warrant based on Uzbek criminal charges

---

that "special circumstances" existed to justify continued detention. *See* 8 U.S.C. § 1231(a)(1)(A) (giving the Attorney General 90 days to remove an alien after a removal order); *id.* § 1231(a)(3), (6) (permitting aliens to be held in continued detention or released under continued supervision at the end of the initial 90-day period); *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (prohibiting indefinite detention and limiting "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal"); 8 C.F.R. § 241.13(b)(2)(i), (c), (e)(6), (g) (mandating special review procedures and the release of the alien in the absence of "special circumstances" justifying continued detention).

in connection with bombings in Uzbekistan in March and April 2004. DHS later acknowledged that the "*jihad*" e-mail was addressed to Zakirov rather than Samadov and that it had no evidence connecting Samadov to the Uzbek bombings, which occurred while he was in the United States. But the BIA already had reopened and remanded the case to the IJ.

On remand, Samadov testified that he had not viewed the video clips (and now points to Yusupov's credited testimony that he, Yusupov, had viewed the clips), never engaged in violent activities, and that Islam condemns violence. In response to a question whether he had sent money to followers of Imam Nazarov, Samadov answered that he had sent approximately $200 to Uzbekistan in charitable donations. He said that he could not recall whether he had wired additional money for charity, but that if he did it would have been to his brother. At a later hearing, Samadov conceded that he had sent $3,000 to his brother, but asserted that he had not mentioned this sum previously because it was a repayment of a debt rather than the type of charitable donation about which he was asked. The IJ made an adverse credibility determination on the basis of this exchange.

The IJ denied Samadov's second application for asylum as untimely. She concluded that Samadov was ineligible for withholding of removal because the national security exception applied. The basis for the finding stemmed from (1) the computer files found on the hard drive of the computer in

18

Samadov's residence, (2) his lack of candor concerning the money sent to Uzbekistan, and (3) opening his house to Uzbek nationals, one of whom received an e-mail mentioning "*jihad*." *In re Samadov*, No. A 79-729-711 at 11 (IJ Dec. Aug. 2, 2005). "At the very least," the IJ stated, Samadov "provided material support to an individual whom he knew or should have known had committed or intended to commit terrorist activity." *Id.* (citation omitted). Nevertheless, the IJ granted deferral of removal under the CAT on the ground that Samadov faced likely persecution upon return. Both parties appealed to the BIA—Samadov appealing the denial of asylum and withholding of removal, and DHS appealing the grant of deferral of removal.

The BIA dismissed both appeals. It agreed that Samadov was ineligible for withholding of removal because "there is sufficient evidence that would permit a reasonable person to believe that the respondent may pose a danger to the Nation's defense, foreign relations, or economic interests." *In re Samadov*, No. A 79-729-711, at 2 (BIA Dec. May 24, 2006). Declining to state conclusively whether it agreed with the IJ "that the material support [to terrorism] bar is satisfied by the facts of this case," the BIA held that Samadov was ineligible for withholding of removal because the Attorney General stated that "'reasonable grounds' exist where there is 'information that would permit a reasonable person to believe that the alien *may* pose a danger to the national security.'" *Id.* (citing *In re A–H–*, 23 I. & N. Dec. at 788) (emphasis added). It based this decision on the following evidence: (1) the 2003 extradition request, (2)

19

the 2004 Interpol notice, (3) the aforementioned video-clips from the computer in Samadov's house, (4) a DHS Memorandum of Investigation describing the contents of those videos, (5) the Pennsylvania State Police map taken from the computer in Samdov's residence, (6) the "*jihad*" e-mail to Zakirov, and (7) DHS Special Agent Mark W. Olexa's testimony that Zakirov later "fled" to Canada. *Id.* at 2–3. Nevertheless, the BIA upheld the IJ's grant of deferral of removal because "[t]he record is replete with documentary evidence . . . which supports the finding that it is more likely than not that [Samadov], an Independent Muslim, would be subjected to torture if removed to Uzbekistan." *Id.* at 3.

### C.  Petitions for Review

Yusupov and Samadov now petition us for review.[13]

---

[13]Samadov was represented superbly by counsel acting *pro bono*. The Court expresses its appreciation for the outstanding efforts of Paul A. Engelmeyer and Bassina Farbenblum (the latter argued Samadov's case) in the New York office of the Wilmer Cutler Pickering Hale and Dorr law firm. (Not only did they represent Samadov; they also submitted an *amicus curiae* brief in Yusupov's case on behalf of the Harvard Immigration and Refugee Clinic and others.)

While Yusupov's counsel – Lawrence H. Rudnick of the Steel, Rudnick & Ruben law firm in Philadelphia – is not technically providing *pro bono* services, we understand that he is accepting a substantially discounted fee. That action, and his

They argue that the BIA erred in applying the Attorney General's interpretation of the national security exception. Petitioners contend that this interpretation is unreasonable, and thus not entitled to *Chevron* deference, because it is inconsistent with the plain meaning of the statute and its statutory context, and is contrary to United States treaty obligations.[14]

## III.    Jurisdiction & Standards of Review

### A.    Jurisdiction

We have jurisdiction to review the Board's final orders of removal under INA § 242(a)(1), 8 U.S.C. § 1252(a)(1). *See Sukwanputra v. Gonzales*, 434 F.3d 627, 631 (3d Cir. 2006).[15]

---

adroit advocacy, are much appreciated as well.

[14]Samadov does not argue, as he had done previously, that he is entitled to remain in this country because of his marriage to a United States citizen. Thus we do not address this issue.

[15]We have concluded previously that 8 U.S.C. § 1252(a)(2)(B)(ii) does not strip us of jurisdiction to review the Attorney General's determinations pertaining to the mandatory withholding of removal provision and the "serious crime" and "danger to community" exception of the INA because Congress did not "specif[y]" discretion in the Attorney General. *See Alaka v. Att'y Gen.*, 456 F.3d 88, 96–97 & n.14 (3d Cir. 2006) (analyzing 8 U.S.C. § 1231(b)(3)(B)(ii)).  That logic applies

21

An order of removal becomes final upon, *inter alia*, "a determination by the [BIA] affirming such order." 8 U.S.C. § 1101(a)(47)(B)(i). The Supreme Court has specified that administrative orders are final when they mark the "consummation" of the agency's decision-making process, and when "rights or obligations have been determined" or when "legal consequences will flow" from the decision. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

"[O]rdinarily a remand to an administrative agency is not a final order" for purposes of "appellate jurisdiction." *Dir., Office of Workers' Comp. Programs v. Brodka*, 643 F.2d 159, 161 (3d Cir. 1981). But several of our sister circuit courts of appeals have concluded that an order is final for jurisdictional purposes when a removability determination has been made that is no longer appealable to the BIA, regardless whether a formal order of removal has been entered—*see*, *e.g.*, *Lazo v. Gonzales*, 462 F.3d 53, 54 (2d Cir. 2006) ("[T]he statutory requirement of an order of removal is satisfied when—as here—the IJ *either* orders removal or concludes that an alien is removable." (emphasis in original)); *Solano-Chicas v. Gonzales*, 440 F.3d 1050, 1053–54 (8th Cir. 2006) (holding that BIA reversal of IJ's cancellation of removal created a final order of removal); *Nreka*

equally to the national security exception, a fact demonstrated by our exercising jurisdiction in *McAllister v. Att'y Gen.*, 444 F.3d 178, 189 (3d Cir. 2006) (reviewing application of national security exception).

*v. Att'y Gen.*, 408 F.3d 1361, 1367 (11th Cir. 2005) (asserting jurisdiction over a BIA determination denying asylum without an express final order of removal because denial of asylum is so closely tied to removal)—and even if the BIA has remanded for limited further proceedings. *See, e.g.*, *Saldarriaga v. Gonzales*, 402 F.3d 461, 466 n.2 (4th Cir. 2005) (finding jurisdiction when voluntary departure motion still pending before IJ); *Del Pilar v. Att'y Gen.*, 326 F.3d 1154, 1156–57 (11th Cir. 2003) (finding jurisdiction where country of removal at issue before IJ); *Castrejon-Garcia v. INS*, 60 F.3d 1359, 1361–62 (9th Cir. 1995) (holding that a BIA order reversing an IJ's decision to grant suspension of removal and remanding "for a determination of voluntary departure in lieu of deportation" was a final order of removal, as nothing was pending before the BIA and "the petitioner had no reason or basis for appealing the [IJ's] decision in his favor").

We agree with these decisions and conclude that we have jurisdiction[16] over these petitions. The BIA affirmed the IJ's

---

[16]The BIA had jurisdiction to review the appeals from the IJ's decisions in the removal proceedings under 8 C.F.R. § 3.2 (amended as 8 C.F.R. § 1003.1(b)(3) (effective April 1, 2005)). The change in regulations is not significant to our review of the cases.

The Attorney General correctly notes that we lack jurisdiction over Samadov's petition to the extent that Samadov argues that the IJ and the BIA erred in failing to find that he

denial of each asylum application as untimely, vacated the decision to grant withholding of removal (for Yusupov), denied withholding of removal (for Samadov), and upheld the decisions to grant the limited remedy under the CAT of deferral of removal (for both).

The BIA remanded both cases to the IJ pursuant to 8 C.F.R. § 1003.1(d)(6)[17] "for the purpose of allowing [DHS] the opportunity to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h)."[18] These administrative matters do not

---

qualified for an exception to the one-year limit for filing for asylum. *See Sukwanputra*, 434 F.3d at 633–34.

[17]This section requires the Board to update identity, background checks, and other security investigations before issuing a decision granting protection from removal, 8 C.F.R. § 1003.1(d)(6)(i)(A), and allows the Board to "determine the best means to facilitate the final disposition of the case," including through a remand, *id.* § 1003.1(d)(6)(ii).

[18]Section 1003.47(h) requires IJs to consider, on remand, "the results of the identity, law enforcement, or security investigations or examinations," and "[i]f new information is presented, [allows them to] hold a further hearing if necessary to consider any legal or factual issues, including issues relating to credibility, if relevant," and "then [to] enter an order granting

24

affect the controlling removal determination. Accordingly, the BIA determinations here are final within the meaning of the INA, and we have jurisdiction to review them.[19]

or denying the immigration relief sought."

[19]Another opinion filed today at first glance may give a reader the impression that it and our opinion are at odds on this jurisdictional point. *Vakker v. Attorney General*, Case No. 06-1949, __ F.3d __ (3d Cir. March 14, 2008), involved an alien who prevailed before the BIA, successfully claiming that he was entitled to withholding of removal. The BIA subsequently remanded for a background check. That background check could have affected his eligibility for withholding of removal. For example, it could have revealed that he was a member of a terrorist organization and thus barred from withholding of removal by the national security exception. Thus the BIA's order granting withholding of removal in *Vakker* was not final prior to the completion of the background check, and jurisdiction was lacking.

Our case, on the other hand, involves two aliens who the BIA concluded were barred from withholding of removal. Nothing in their background checks could affect that determination. Nor could the background checks affect Yusupov's and Samadov's eligibility for deferral of removal. Deferral of removal may be withdrawn only if new evidence indicates that it no longer is more likely than not that an alien will be tortured in the country of removal. *See* 8 C.F.R. § 208.17(d). Discovery of a negative fact in the alien's background (*e.g.*, that he has committed aggravated felonies or

25

## B.  Standards of Review

We uphold the BIA's determinations if they are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Li v. Att'y Gen.*, 400 F.3d 157, 162 (3d Cir. 2005) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).  We review the IJ's factual findings under this same substantial evidence standard where, as here, "'the BIA directs us to the opinion and decision of the IJ who originally assessed [the] application.'"  *Shah v. Att'y Gen.*, 446 F.3d 429, 434 (3d Cir. 2006) (quoting *Dia v. Ashcroft*, 353 F.3d 228, 240 (3d Cir. 2003) (*en banc*)).

We exercise *de novo* review over constitutional claims or questions of law and the application of law to facts.  8 U.S.C. § 1252(a)(2)(D); *Alaka*, 456 F.3d at 94 n.8, 102; *Kamara v. Att'y Gen.*, 420 F.3d 202, 210–11 (3d Cir. 2005).

---

that he has joined a terrorist organization) would not alter his eligibility for deferral of removal.  In fact, the relevant regulation presumes that an alien receiving deferral of removal still "is subject to the provisions for mandatory denial of withholding of removal." *Id.* at § 208.17(a).  Accordingly, the BIA's orders in these cases provided a final adjudication of the substantive rights of Yusupov and Samadov.  We consequently have jurisdiction.

"The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9. However, "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *Aguirre-Aguirre*, 526 U.S. at 425 (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)). The Supreme Court has explained that "[i]t is clear that principles of *Chevron* deference are applicable" to the INA because that statute charges the Attorney General with the administration and enforcement of the statute, makes controlling the determinations and rulings of the Attorney General with respect to all questions of law, and confers decisionmaking authority on the Attorney General with respect to an alien's entitlement to withholding of removal. *Id.* at 424–25 (quoting 8 U.S.C. §§ 1103(a)(1), 1253(h)). We also "afford *Chevron* deference to the BIA's reasonable interpretations of statutes which it is charged with administering." *Kamara*, 420 F.3d at 211 (citing *Aguirre-Aguirre*, 526 U.S. at 424, and *Chevron*, 467 U.S. at 842); *see also Tineo v. Aschcroft*, 350 F.3d 382, 396 (3d Cir. 2003) ("There is also no longer any question that the BIA should be accorded *Chevron* deference for its interpretations of the immigration laws."); *Gao v. Ashcroft*, 299 F.3d 266, 271 (3d Cir. 2002) (explaining that BIA interpretations of the INA are entitled to *Chevron* deference because the Attorney General vested the BIA with power to exercise the discretion conferred on him by law). Thus we turn to how *Chevron* affects this case.

27

*Chevron* deference involves a two-step inquiry. At step one, the court must determine "whether Congress has directly spoken to the precise question at issue" and "unambiguously expressed [its] intent." *Chevron*, 467 U.S. at 842–43. If so, the inquiry ends, as both the agency and the court must give effect to the plain language of the statute. *Id.* at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").

When "the statute is silent or ambiguous with respect to the specific issue," the court proceeds to step two, where it inquires whether the agency's "answer is based on a permissible construction of the statute." *Id.* at 843. "If a statute is ambiguous [or silent], and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citing *Chevron*, 467 U.S. at 843–44 & n.11).

## IV.    Analysis

Having concluded that we have jurisdiction and determined the standards for review, we turn to the national security exception to mandatory withholding. We consider the interpretation of two portions of the exception: "reasonable

28

grounds to believe," and "is a danger to the security of the United States." For the sake of clarity, we perform the *Chevron* analysis separately for each challenged portion of the Attorney General's interpretation of the national security exception. *See, e.g., Sec'y of Labor, Mine Safety, & Health Admin. v. Nat'l Cement Co. of Cal.*, 494 F.3d 1066, 1073 (D.C. Cir. 2007) (taking a similar approach by analyzing separately under *Chevron* step one the terms "private" and "appurtenant to" in the statutory definition of "coal or other mine"). In so doing, we adhere to the instruction that in "ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole." *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992).

### A. "Reasonable grounds to believe"

#### 1. *Chevron* Step One

Yusupov argues that Congress' use of the phrase "reasonable grounds to believe" demonstrates its clear intent to incorporate a probable cause[20] standard borrowed from criminal

---

[20]Black's Law Dictionary defines "probable cause" in the criminal law context as "[a] reasonable ground to suspect that a person has committed or is committing a crime or that a place contains specific items connected with a crime." Black's Law Dictionary 1239 (8th ed. 2004). It explains that "[u]nder the

29

law into the national security exception. However, it is not clear that we should read this phrase through the lens of criminal law. Congress was free to write a standard without considering our criminal law jurisprudence. The statutory context does not indicate that Congress clearly intended to incorporate criminal law standards. For example, immediately before the national security exception, the statute prohibits withholding of removal if "there are serious reasons to believe that the alien committed a serious nonpolitical crime outside the United States." INA § 241(b)(3)(B)(iii), 8 U.S.C. § 1231(b)(3)(B)(iii). The "serious reasons" standard does not map clearly to any criminal law criterion. This suggests that the statute creates a series of standards that may share surface similarities with those of criminal law, but that need not be reduced to criminal law equivalents.[21]

---

Fourth Amendment, probable cause – which amounts to more than a bare suspicion but less than evidence that would justify a conviction – must be shown before an arrest warrant or search warrant may be issued." *Id.* It identifies as synonyms the terms "reasonable cause; sufficient cause; reasonable grounds; reasonable excuse." *Id.* (italics removed). (Black's also defines "probable cause" in the torts context as "[a] reasonable belief in the existence of facts on which a claim is based and in the legal validity of the claim itself." *Id.*)

[21]It is true that the BIA adopted what appears to be a probable cause standard in analyzing the similar language of INA § 212(a)(3)(B)(i)(II) (prohibiting entry into the United States if

More simply, if Congress wished to ensure the incorporation of a probable cause standard, it could have done so explicitly. In that event, we would assume that, because Congress used a term of art, it intended to incorporate the requirements imposed by the jurisprudence regarding that term. *See McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991); *Morrissette v. United States*, 342 U.S. 246, 263 (1952). Absent explicit use of a term of art, we hesitate to make comparable assumptions.

Accordingly, we are unpersuaded that the phrase "reasonable grounds to believe," which is not defined in the INA, is unambiguous. As petitioners note, there are strong arguments that it means "probable cause," including the fact that Black's Law Dictionary defines "reasonable grounds" as equivalent to "probable cause." *See* Black's Law Dictionary, *supra* note 20, at 1239. However, just as a term with multiple definitions may be unambiguous in context, *see Brown v. Gardner*, 513 U.S. 115, 118 (1994), the existence of a single definition in Black's Law Dictionary does not preclude a term

---

the Attorney General, a consular officer, or the DHS Secretary "knows, or has reasonable ground to believe, [that an alien] is engaged in or is likely to engage after entry in any terrorist activity"). *See In re U–H–*, 23 I. & N. Dec. 355, 356 (BIA 2002). However, this is not equivalent to a court concluding that Congress clearly intended to adopt a probable cause standard.

31

from being ambiguous in context. Because of the ambiguity we perceive, we pass to the second step of the *Chevron* analysis as to that term—whether the Attorney General's interpretation is reasonable.

## 2.    *Chevron* Step Two

The Attorney General[22] began the interpretation of "reasonable grounds for regarding" by agreeing with the conclusion of the First Circuit Court of Appeals in *Adams v. Baker*, 909 F.2d 643, 649 (1st Cir. 1990), that the statutory reference to "reasonable" grounds "implies the use of a reasonable person standard." *In re A–H–*, 23 I. & N. Dec. at 788. This, the Attorney General concluded, was "consistent with the BIA's reliance on 'probable cause' cases." *Id.* He faulted the BIA, however, for equating probable cause with a preponderance of the evidence standard, explaining that "'reasonable grounds for regarding' is substantially less stringent than preponderance of the evidence." *Id.* at 789. Instead, the Attorney General concluded, "[t]he 'reasonable grounds for regarding' standard is satisfied if there is information that would permit a reasonable person to believe

---

[22]The Attorney General overruled the decision of the BIA in *In re A–H–* after that case was referred to him by the Acting Commissioner of the INS. *See* 8 C.F.R. § 3.1(h)(1)(iii) (now amended as 8 C.F.R. § 1003.1(h)(1)(iii) to reflect creation of DHS).

that the alien may pose a danger to the national security." *Id.*

In this context, the Attorney General appears implicitly to have adopted a "probable cause" standard from criminal law, a fact acknowledged in the responses to these petitions. Atty Gen.'s Br. in Samadov 27 ("The Attorney General . . . held that the term 'reasonable grounds' . . . was akin to the standard required for probable cause."); Atty Gen.'s Br. in Yusupov 22 (same). Indeed, the Attorney General appears to have assumed that "probable cause" and "reasonable grounds" are synonymous. We focus our analysis on the resulting interpretive standard adopted by the Attorney General.[23]

We know of no basis for doubting the reasonableness of the Attorney General's interpretation of "reasonable grounds for regarding" as being satisfied "if there is information that would

---

[23]Accordingly, we do not attempt to discern whether another standard, such as the "reasonable suspicion" test articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), would be more appropriate. We note that the Attorney General did not discuss *Terry* in *In re A–H–.* Any suggestion (including the suggestion made by government counsel at oral argument and, somewhat obliquely, in its briefing) that we should adopt that standard would be a litigation position entitled to no deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (explaining that courts should not defer "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice").

33

permit a reasonable person to believe." Although we conclude that the statutory language does not demonstrate a clear congressional intent to adopt a probable cause standard, the Attorney General's adoption of a standard akin to probable cause in criminal cases is also reasonable, and thus "a permissible construction of the statute." *See Chevron*, 467 U.S. at 843–44 & n.11.

The Attorney General also decided in *In re A–H–* that "[t]he information relied on to support the 'reasonable grounds' determination need not meet standards for admissibility of evidence in court proceedings." *A–H–*, 23 I. & N. Dec. at 789. We reject the contention that this was unreasonable, as nothing in the statute requires that the information to be considered must be admissible under the Federal Rules of Evidence. In so doing, we agree with the First Circuit Court of Appeals in recognizing that the immigration context is different from that of a courtroom. *See Adams*, 909 F.2d at 649. Petitioners fail to point to anything in the INA that incorporates the Rules of Evidence. Rather, the INA imposes an implicit requirement that the evidence be reliable enough to allow a reasonable person to decide that the alien poses a national security risk. The Attorney General thus is reasonable to interpret the national security exception as allowing the consideration of any evidence that is "not 'intrinsically suspect.'"[24] *See A–H–*, 23 I. & N. Dec. at 790

___

[24]Because we do not reach the merits of Samadov's case, we need not consider his argument that the Attorney General's

34

(quoting *Adams*, 909 F.2d at 649).

Because the Attorney General's interpretations of the ambiguous phrase "reasonable grounds to believe," and the type of evidence allowable in making that determination, are reasonable, we defer to them under *Chevron*.

### B. "Is a danger to the security of the United States"

We turn to the Attorney General's interpretation of the phrase "is a danger to the security of the United States." The ordinary meaning of "danger" is "peril"; "exposure to harm, loss, pain, or other negative result"; "cause of peril"; or "menace." Black's Law Dictionary, *supra* note 20, at 421. Here, the Attorney General reasons: "Read as a whole . . . the phrase 'danger to the security of the United States' is best understood to mean a risk to the Nation's defense, foreign

---

decision to follow *Adams* violates the Fifth Amendment's Due Process Clause. We have explained that, in the removal context, "whether an individual's constitutional rights are violated turns on whether the evidence considered by the BIA is reliable and trustworthy." *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 405 (3d Cir. 2003). The Attorney General's refusal to consider evidence that is "intrinsically suspect" may appear to defeat a due process claim. However, because we do not consider the evidence in this case, we do not rule definitively on this issue.

relations, or economic interests." *Accord In re A–H–,* 23 I. & N. Dec. at 788. This interpretation follows the definition of "national security" used for a separate section of the INA. *See* INA § 219(d)(2), 8 U.S.C. § 1189(d)(2) (defining "national security," for the purposes of that section, as "the national defense, foreign relations, or economic interests of the United States").

We are not asked to determine the contours of risk to our Nation's defense, foreign relations, or economic interests. Instead, applying the *Chevron* analysis, we consider petitioners' arguments that, for the national security exception to apply, (1) it is incorrect for the Attorney General to conclude that an alien *may* pose a risk to national security, and (2) any danger to national security must be "serious" and not just "non-trivial."

### 1. "Is a danger" versus "may pose a danger"

Although we defer to the Attorney General's interpretation of the phrases "reasonable grounds to believe" and (as discussed below) "danger to the security of the United States," we do not defer to his reading of "is a danger." "Is" does not mean "may," as suggested by the Attorney General's formulation that the national security exception "is satisfied if there is information that would permit a reasonable person to believe that the alien *may* pose a danger to the national security." *In re A–H–,* 23 I. & N. Dec. at 789 (emphasis

36

added). This interpretation accords with neither the plain wording nor the ordinary meaning of the statutory text, which does not refer to belief in a mere possibility. In other words, "is"—and its subjunctive form "would"—connote a more certain determination than that "the alien 'might' or 'could' be" a danger for the national security exception to apply. *See INS v. Stevic*, 467 U.S. 407, 422 (1984) ("The section ['would be threatened'] literally provides for withholding of deportation only if the alien's life or freedom 'would' be threatened in the country to which he would be deported; it does not require withholding if the alien 'might' or 'could' be subject to persecution.").

Instead, we must take the statute to mean what it says: "is" indicates that Congress intended this exception to apply to individuals who (under a reasonable belief standard) actually pose a danger to U.S. security. It did not intend this exception to cover aliens who conceivably could be such a danger or have the ability to pose such a danger (a category nearly anyone can fit).[25] Accordingly, the Attorney General's interpretation of "is a danger" as "may pose a danger" fails at the first step of the *Chevron* analysis.

The introduction of "may" in the statement of the

---

[25]As noted below, courts in other countries also have interpreted the national security exception to require a serious danger that is actual, not theoretical.

37

standard in *In re A–H–* perhaps is no more than an unintentional and inartful articulation on the part of the Attorney General. Indeed, in remanding the case, the Attorney General directed the BIA to inquire whether "the evidence would support a reasonable belief that respondent *poses* a danger to our national security interests." *In re A–H–*, 23 I. & N. Dec. at 790 (emphasis added). However, as discussed below, the BIA quoted the former, incorrect phrasing in petitioners' cases. Thus we cannot conclude that the error of *In re A–H–* reflects nothing more than the specific posture of that case and that it could not have affected petitioners.

Nor do we agree with an argument that we may affirm nonetheless on this point because, even if it *recited* an incorrect standard, the BIA *applied* the correct standard—*i.e.*, it inquired whether each petitioner "is" a danger to the security of the United States. We agree that we should ask whether the correct standard was applied in petitioners' cases. *See Lavira v. Att'y Gen.*, 478 F.3d 158, 165 (3d Cir. 2007). However, we disagree that the application of a correct standard can be discerned from the record before us. In Yusupov's proceedings, the BIA stated that the IJ determined that "the government failed to meet the threshold for establishing that an alien *poses* a national security risk" before itself concluding that "the record contains information that would lead a reasonable person to believe that the respondent *may pose* a danger to national security." *In re Yusupov*, No. A 79-729-905 (BIA Dec. Aug. 26, 2005) (emphases added). Similarly, in the Samadov proceedings, the

38

BIA noted that the IJ had found "the requisite 'reasonable grounds to believe that the alien *is* a danger to the security of the United States'" before affirming on the basis that the record contained "sufficient evidence that the respondent *may pose* a danger to [national security]." *In re Samadov*, No. A 79-729-711 (BIA Dec. May 24, 2006) (emphases added). These differences may not have affected the result in either case, but we cannot assume this to be true. Given the important interests at stake and the BIA's expertise, we conclude that it would be most appropriate to remand these cases to that body for review under the correct standard.[26]

### 2. Whether "danger to the security of the United States" Requires the Modifier "serious"

Petitioners argue that an alien threatens the security of the United States only if the danger is "serious." Although they do not make that claim within the *Chevron* framework, we consider

---

[26]We thus make no comment on the sufficiency of the evidence for a determination that Yusupov and Samadov are subject to the national security exception to mandatory withholding. In so refraining, we follow the rule laid down by the Supreme Court in *INS v. Ventura*, 537 U.S. 12, 16 (2002) (*per curiam*). *Accord Silva-Rengifo*, 473 F.3d at 71 (remanding the case after clarifying the proper legal standard, thus allowing the BIA to apply the correct standard in the first instance).

it in terms of that analysis, asking whether the Attorney General's interpretation of the statutory language is entitled to deference. We conclude that we should defer.

To repeat, at the first step of the *Chevron* analysis we ask whether the statute announces a clear congressional intent as to the meaning of the phrase "danger to the security of the United States." Petitioners argue that the legislative history of U.S. adoption of refugee protections and an international consensus compel the conclusion that Congress clearly intended for a national security danger to be "serious" for an exception to mandatory withholding of removal to apply.

The national security exception was passed as part of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. *See Aguirre-Aguirre*, 526 U.S. at 419–20. It grew out of the United Nations Convention Relating to the Status of Refugees. 189 U.N.T.S. 150 (July 28, 1951) (the 1951 U.N. Convention). Section 203(e) of the Refugee Act amended existing law on the withholding of removal, "basically conforming it to the language of Article 33 of the United Nations Protocol [Relating to the Status of Refugees, Jan. 31, 1967, [19] U.S.T. 6223, T.I.A.S. No. 6577]" (the 1967 U.N. Protocol). *Stevic*, 467 U.S. at 421.[27] The main provision of the 1967 U.N. Protocol is

---

[27]The 1967 U.N. Protocol "bound parties to comply with the substantive provisions of Articles 2 through 34 of the [the 1951 U.N. Convention]." *Stevic*, 467 U.S. at 416. The United States

40

Article 33.1—the so-called "*nonrefoulement*" obligation.[28]  It provides that a contracting country must not expel or return a refugee to a country where his "life or freedom would be threatened on account of his race, religion, nationality, membership [in] a particular social group or political opinion." Article 33.2 provides an exception to that rule when "there are reasonable grounds for regarding [the refugee] as a danger to the security of the country in which he is."

Foreign courts[29] and international law scholars[30] appear

---

is not a signatory to the 1951 U.N. Convention.  *Id.* n.9.

[28]For a detailed explanation of the term "*refouler*," see *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 180–82 & nn.37–40 (1993).

[29]Foreign courts uniformly have read the national security exception (in equivalent wording) to require reasonable belief in a danger that is serious and actual.  *See Zaoui v. Attorney General*, [2005] 1 N.Z.L.R. 690, ¶ 135–36 (C.A.) (interpreting the phrase "danger to the security of New Zealand"); *Suresh v. Canada (Minister of Citizenship & Immigration)*, [2002] 1 S.C.R. 3, ¶ 90, 92 (interpreting the phrase "danger to the security of Canada"); *NSH v. Sec'y of State*, (1998) Imm. A.R. 389, 395 (Eng. C.A.) (interpreting the phrase "danger to the security of the country").

[30]International law scholars agree (unanimously so far as we can tell) that Article 33.2 carves out a limited exception to

41

to be unanimous in viewing the Article 33.2 exception as referring to a serious danger. The legislative history[31] of the Refugee Act of 1980 makes clear that Congress intended to protect refugees to the fullest extent of our Nation's

---

mandatory withholding, and that the "danger" sufficient to threaten national security encompasses only serious acts. *See, e.g.*, James C. Hathaway, The Rights of Refugees Under International Law 346 (2005); Sir Elihu Lauterpacht & Daniel Bethlehem, The Scope & Content of the Principle of *Non-Refoulement*, ¶¶ 170, 191 (UNHCR 2001); Atle Grahl-Madsen, Commentary on the Refugee Convention 1951, 236 (UNHCR 1963) (that "danger" encompasses "acts of a rather serious nature"); Paul Weis, The Refugee Convention, 1951: The *Travaux Preparatoires* Analysed with a Commentary 342-43 (1995).

It is worth noting that the Supreme Court has cited Grahl-Madsen and Lauterpacht as authoritative. *See, e.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 n.24 (1987) (Grahl-Madsen); *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 710 n.3 (1976) (Lauterpacht); *id.* at 728 n.14 (Marshall, J., dissenting) (Lauterpacht).

[31]We recognize that courts often look to legislative history because it can be a useful aid to statutory construction, and to international law to the extent that it has been incorporated into our law. *See Cardoza-Fonseca*, 480 U.S. at 432–33 & n.12.

international obligations.[32]  Indeed, petitioners appear to be correct that Congress intended to allow exceptions to our *nonrefoulement* obligations only in a narrow set of circumstances.

---

[32]"The principal motivation for the enactment of the Refugee Act of 1980 was a desire to revise and regularize the procedures governing the admission of refugees into the United States," *Stevic*, 467 U.S. at 425, and to make "U.S. statutory law clearly reflect[] our legal obligations under international agreements." *Id.* at 426 n.20 (internal quotation marks omitted); *see also Haitian Centers Council*, 509 U.S. at 178 (pointing out that the "history of the 1980 Act does disclose a general intent to conform our law to Article 33 of the Convention"); *Cardoza-Fonseca*, 480 U.S. at 436 (noting that "one of Congress' primary purposes was to bring United States refugee law into conformance with" the 1967 U.N. Protocol); *Marincas v. Lewis*, 92 F.3d 195, 198 (3d Cir. 1996) ("[T]he Refugee Act was enacted to fulfill our treaty obligations under the [1967] U.N. Protocol for the benefit of aliens . . . who claim to be fleeing persecution in their homelands.").

The adoption of essentially identical language to that contained in Article 33 of the 1967 U.N. Protocol is important because it is one of the strongest indicators that Congress intended to incorporate the understanding of the Protocol developed under international law into the U.S. statutory scheme. *See Haitian Centers Council*, 509 U.S. at 180 & n.36; *Cardoza-Fonseca*, 480 U.S. at 429, 432, 437.

43

However, petitioners' argument ignores that "danger to the security of the United States" includes an inherent seriousness requirement. It does not easily accord acceptable gradations, as almost any "danger" to U.S. security is serious. Congress did not announce a clear intent that the danger to U.S. security be "serious" because such a modifier likely would be redundant. As we understand their argument, petitioners in effect ask us to hold that Congress clearly intended that the national security exception only apply to individuals who pose a severely serious danger to our Nation. We cannot grant such a request, as it would be illogical for us to hold that Congress clearly intended for an alien to be non-removable if he poses only a moderate danger to national security.

Congress was obviously silent as to any modifier for "danger." Thus we proceed to step two in our *Chevron* analysis. *See Chevron*, 467 U.S. at 843 (directing reviewing court to pass to step two if the statute is "silent or ambiguous with respect to the specific issue"). Accordingly, the only remaining question in these petitions for review[33] is whether the Attorney General

---

[33]Future cases may challenge the Attorney General's interpretation of what constitutes "the security of the United States." For example, we can imagine questions arising as to whether certain financial crimes might rise to the level of implicating the economic interests aspect of national security. That is not the question before us here, however, as the basic allegation about petitioners is, in effect, that they support illegal

44

interpreted the national security exception reasonably in concluding that it applied to any "nontrivial level of danger" or "nontrivial degree of risk"[34] to U.S. security. *See A–H–*, 23 I. & N. Dec. at 788. Like a "seriousness" requirement, the modifier "non-trivial" likely is redundant.[35] In this context, the Attorney General was not unreasonable, even if this turns out to reflect an excess of caution, to ensure that immigration judges do not consider trivial dangers in applying the national security exception. Accordingly, we defer to the Attorney General's

terrorist groups who aim to commit violent acts against the United States.

[34]"Danger" inherently requires a heightened level of risk. "Risk" can be used synonymously with "probability," without giving an indication of likelihood. In contrast, "risk" is used in common legal parlance to indicate a heightened likelihood that an event may occur. For example, while there is a possibility that any criminal defendant will flee, a court will not consider a defendant a "flight risk" unless there is a heightened possibility of such flight. The distinction between "danger" and "risk" is not at issue in this case, but we have no doubt that the Attorney General uses "risk" as synonymous with "danger."

[35]We recognize that the Attorney General defined "nontrivial" dangers or risks in distinction to those that are "serious," "significant," or "grave." *See id.* However, we note that the distinction between "serious" and "nontrivial" may be one without a difference, and in any event appears to have no practical effect.

45

interpretation.

**V.      Conclusion**

Per the principles of *Chevron*, we defer to most of the Attorney General's interpretation of the national security exception to mandatory withholding of removal.  We defer to his interpretation of the reasonableness and danger requirements in that exception.  However, his interpretation conflicts with the intent of Congress by altering the requirement that an alien "is" a danger to national security to one where an alien "*may* pose" a danger to national security.  Because we cannot discern from the record whether the results in petitioners' cases were affected by this misinterpretation, we remand for application of the correct legal standard.