PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-4598

———

BLANCA BARRALES PAREJA,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

———

On Petition for Review from an
Order of the Board of Immigration Appeals
(Board No. A098-632-579)
Immigration Judge:  Honorable Eugene Pugliese

———

Argued June 23, 2010
Before:  SMITH, FISHER and GREENBERG,
*Circuit Judges*.

(Filed: July 29, 2010)

David A. Isaacson (Argued)
2 Wall Street, 6th Floor
New York, NY 10005

     *Counsel for Petitioner*

Linda Y. Cheng (Argued)
W. Daniel Shieh
United States Department of Justice
Office of Immigration Litigation, Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

     *Counsel for Respondent*

————

OPINION OF THE COURT

————

FISHER, *Circuit Judge*.

Blanca Barrales Pareja, a Mexican citizen and native, petitions for review of a final order of removal of the Board of Immigration Appeals ("BIA"). We will grant the petition in part, deny it in part, and dismiss it in part and remand this case to the BIA with instructions.

**I.**

2

In March 1991, when she was thirteen years old, Pareja entered the United States without inspection to reunite with her parents, who had previously come to the United States from Mexico. In December 2001, Pareja gave birth to a daughter, Joanne, with Cesar Garcia. Joanne is a United States citizen and has never been to Mexico. In 2005, Pareja and Garcia's relationship ended. Garcia, who is not a United States citizen, provides child support for Joanne and sees her about twice a month. For the last several years, Pareja has worked for the Sheehy family in Colts Neck, New Jersey, performing childcare and housework.[1] Pareja and Joanne live with the Sheehys in their home. Joanne attends a local public school.

Pareja received a Notice to Appear in April 2006, charging that she was removable under 8 U.S.C. § 1182(a)(6)(A)(i).[2] Pareja conceded removability but applied for cancellation of removal under 8 U.S.C. § 1229b(b)(1). In September 2007, an Immigration Judge ("IJ") held a hearing at which Pareja spoke about her background and life in the United States and told the IJ that Joanne would accompany her if she

---

[1]The transcript of the proceeding before the IJ spells the family's name as "Shihi," but Pareja tells us in her brief that the name is actually spelled "Sheehy," and the record elsewhere so reflects. We adopt the latter spelling.

[2]Title 8 U.S.C. § 1182(a)(6)(A)(i) states that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible."

were ordered to return to Mexico. The IJ also heard from Dr. James Kilroy, a clinical psychologist who testified on Pareja's behalf that Joanne is emotionally attached to her mother. Mrs. Sheehy also appeared on Pareja's behalf, testifying that Pareja is loyal and professional and that Joanne becomes anxious when her mother is not present.

After the hearing, the IJ denied Pareja's application in an oral decision, concluding that Pareja did not prove that her removal would result in "exceptional and extremely unusual hardship" to Joanne, the fourth requirement for establishing eligibility for cancellation of removal. *See* 8 U.S.C. § 1229b(b)(1)(D). Relying on the BIA's decision in *Matter of Monreal*, 23 I. & N. Dec. 56 (BIA 2001) (en banc), the IJ determined that Pareja's proffer – consisting mainly of evidence of Mexico's inferior living conditions and lesser educational opportunities as well as Joanne's alleged separation anxiety when her mother is absent – failed to demonstrate that the hardship to Joanne would be "substantially beyond that which would ordinarily be expected to result" from Pareja's removal. (App. 62 (quotation marks and citation omitted).) The IJ found Pareja's proffer similar to that of the petitioner in *Matter of Andazola*, 23 I. & N. Dec. 319 (B.I.A. 2002) (en banc), where the BIA denied cancellation of removal to a single Mexican mother of two children with United States citizenship. The IJ contrasted Pareja's case from *Matter of Recinas*, 23 I. & N. Dec. 467 (B.I.A. 2002) (en banc), where the BIA granted cancellation of removal to a single Mexican mother of six children, four of whom were United States citizens. On the basis of this case law, the IJ denied Pareja's application for cancellation of removal and granted the government's application for voluntary

4

departure. The IJ further ordered Pareja to be removed if she failed to depart voluntarily within a time certain. Pareja appealed the IJ's decision to the BIA.

In October 2008, the BIA dismissed Pareja's appeal. The BIA found no fault with the IJ's factual findings and agreed that Pareja had not met her evidentiary burden of demonstrating "exceptional and extremely unusual hardship" to Joanne, though the BIA thought this "a sympathetic case." (App. 4.) In summarized form, the BIA determined that Joanne, Pareja's lone qualifying relative for hardship purposes under § 1229b(b)(1)(D), had no extraordinary emotional or educational needs; that Joanne's separation anxiety was not a relevant consideration given Pareja's testimony that Joanne would accompany her to Mexico in the event of removal; and that Pareja and Joanne, despite some potential difficulty, were financially able to return to Mexico and to establish themselves there. In a footnote, the BIA summarily declined to revisit its rulings in *Matter of Recinas*, *Matter of Andazola*, and *Matter of Monreal*, which Pareja had attacked as wrongly decided. The BIA also rejected Pareja's efforts to establish parallels between her case and *Matter of Recinas* and to distinguish her case from the BIA's "seminal interpretations," (App. 4 (quotation marks and citation omitted)), of the hardship standard articulated in *Matter of Andazola* and *Matter of Monreal*. Accordingly, the BIA permitted Pareja to depart voluntarily within sixty days from the date of its order. Failing her voluntary departure within that time frame, the BIA ordered that she be removed to Mexico.

Pareja has filed a timely petition for review of the BIA's decision. After the petition was filed, a panel of this Court granted Pareja's motion for a stay of voluntary departure and a stay of removal. The government thereafter filed a motion to dismiss the petition for lack of jurisdiction; that motion was referred to the merits panel. In its brief, the government reiterates its position that this Court lacks jurisdiction over the whole of Pareja's petition.

## II.

### A.   Legislative Background

Before addressing the government's jurisdictional challenge or the merits of any portion of Pareja's petition over which we have jurisdiction, it is useful at the outset to briefly review the historical backdrop of the legislation at issue here.

Under the Immigration and Nationality Act of 1952 ("INA"), an alien placed in deportation proceedings could previously seek relief from deportation by applying for what was called suspension of deportation. 8 U.S.C § 1254(a)(1) (1952). An alien could obtain such relief by showing, among other things, that her deportation "would result in exceptional and extremely unusual hardship to the alien or" certain qualifying relatives. *Id.* Congress amended § 1254(a)(1) in 1962 by replacing the "exceptional and extremely unusual hardship" language with "extreme hardship." 8 U.S.C § 1254(a)(1) (Supp. IV 1959-62) (repealed 1996).

6

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996). In IIRIRA, Congress, among other things, did away with "suspension of deportation," substituted it with a form of relief called "cancellation of removal," and changed the "extreme hardship" standard back to "exceptional and extremely unusual hardship." *Aoun v. INS*, 342 F.3d 503, 506 (6th Cir. 2003); *Hernandez-Mezquita v. Ashcroft*, 293 F.3d 1161, 1162 (9th Cir. 2002); *Angel-Ramos v. Reno*, 227 F.3d 942, 945 (7th Cir. 2000); *Alvidres-Reyes v. Reno*, 180 F.3d 199, 202 (5th Cir. 1999). Congress also limited the hardship inquiry to whether the alien could show hardship to a qualifying relative alone; hardship to the alien herself is no longer a relevant factor. 8 U.S.C. § 1229b(b)(1)(D); *see Karageorgious v. Ashcroft*, 374 F.3d 152, 154 n.4 (2d Cir. 2004); *Hernandez-Mezquita*, 293 F.3d at 1162; *Alvidres-Reyes*, 180 F.3d at 202.

Under the law as it now stands, then, an alien may obtain cancellation of removal if she prevails at both steps of what § 1229b(b)(1) in effect presents as a two-step process. *See Romero-Torres v. Ashcroft*, 327 F.3d 887, 889 (9th Cir. 2003). First, the alien shoulders the burden of showing that she is eligible for cancellation of removal. *See, e.g., Okeke v. Gonzales*, 407 F.3d 585, 588 & n.5 (3d Cir. 2005). An alien is eligible if she

(A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [her] application; (B) has been a person of good moral

7

character during such period; (C) has not been convicted of an offense under . . . [8 U.S.C. § 1182(a)(2), 1227(a)(2), or 1227(a)(3)] . . .; and (D) establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C § 1229b(b)(1).

Second, if the alien meets her burden of establishing eligibility for cancellation of removal, the Attorney General may, in the exercise of his discretion, cancel the alien's removal. 8 U.S.C. § 1229b(b)(1); *see Mendez-Reyes v. Att'y Gen. of the United States*, 428 F.3d 187, 189 (3d Cir. 2005).

In this case, the BIA did not reach the second step of the cancellation-of-removal inquiry because it denied Pareja relief based on its conclusion that she did not demonstrate that she was eligible for cancellation of removal. The parties do not dispute that the first three criteria of § 1229b(b)(1) are met; only the fourth criterion is in play. As noted, the fourth criterion requires that the alien "establish[] that removal would result in exceptional and extremely unusual hardship to" a qualifying relative. 8 U.S.C. § 1229b(b)(1)(D). There is no dispute that Joanne is Pareja's only qualifying relative.

8

## B.     Jurisdiction

Before we reach the merits of Pareja's petition, we must first address the government's argument that we lack jurisdiction over any portion of her petition.[3] *See*, *e.g.*, *Jahjaga*

---

[3]Other than a fleeting reference to *Chevron* deference and citations to cases that support its cause only in the abstract, the government elected not to cover its bases by rebutting the merits of almost any portion of Pareja's petition.  The government evidently presumed that we would agree that we lack jurisdiction over the entirety of her petition.  At oral argument, we brought the deficiencies in the government's brief to the attention of the attorney for the government and asked her to convey our concerns to her superiors.  We trust she has done so, but we think our message is important enough to deserve a written reminder.  The government has every right – a duty, even – to tell us when it believes we lack jurisdiction over a particular case.  But when the government seeks to remove an individual from this country – a result the Supreme Court has recognized as "a drastic measure and at times the equivalent of banishment or exile," *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948) (citation omitted) – it seems to us that the government has an especial obligation to explain, in the event its jurisdictional challenge fails, why the petitioner is wrong on the merits.  The government left that obligation largely unfulfilled here.  Quite recently, we confronted a similar circumstance and underscored the importance of following Rule 31 of the Federal Rules of Appellate Procedure. *Leslie v. Att'y Gen. of the United States*, No. 08-3180, 2010 U.S. App. LEXIS 13952, at *4 n.2

*v. Att'y Gen. of the United States*, 512 F.3d 80, 82 (3d Cir. 2008); *Feliz Debeato v. Att'y Gen. of the United States*, 505 F.3d 231, 233 (3d Cir. 2007).

This Court lacks jurisdiction to review the denial of discretionary relief, including cancellation of removal. 8 U.S.C. § 1252(a)(2)(B)(i). We may, however, review "constitutional claims or questions of law raised upon a petition for review . . . ." *Id.* § 1252(a)(2)(D). Our jurisdiction in that respect is "narrowly circumscribed" in that it is limited to "colorable claims or questions of law." *Cospito v. Att'y Gen. of the United States*, 539 F.3d 166, 170 (3d Cir. 2008) (per curiam) (quotation marks and citation omitted). To determine whether a claim is colorable, we ask whether "it is immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 n.10 (2006) (internal quotation marks and citations omitted). "A petition for review that fails to present . . . a colorable claim is nothing more than an argument that the IJ abused his discretion in determining that the petitioner did not meet the requirement of exceptional and extremely unusual hardship, which is a matter over which we have no jurisdiction." *Mendez-Castro v. Mukasey*, 552 F.3d 975, 978 (9th Cir. 2009) (internal quotation marks and citation omitted). The question of our jurisdiction over a colorable legal claim does not turn on whether that claim is ultimately meritorious. *Barco-Sandoval v. Gonzales*, 516

---

(3d Cir. July 8, 2010). In *Leslie*, we also made clear that a failure to follow that rule could result in the forfeiture of a party's argument. That admonition is equally applicable here.

10

F.3d 35, 41 n.6 (2d Cir. 2007). If a claim is frivolous, however, we lack jurisdiction to review it, no matter its label. *Jarbough v. Att'y Gen. of the United States*, 483 F.3d 184, 189 (3d Cir. 2007). In other words, a party may not dress up a claim with legal clothing to invoke this Court's jurisdiction. *Id.*

Pareja has identified four main issues for our resolution. We address our jurisdiction over each one separately. *See Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 329 (2d Cir. 2006) (a court "need[s] to study the arguments asserted" to assess its jurisdiction).

### 1. Whether *Matter of Monreal* should be overruled

Pareja first claims that the BIA's decision in *Matter of Monreal* should be overruled because the BIA misinterpreted the phrase "exceptional and extremely unusual hardship" in IIRIRA. We have squarely held that because "[t]he decision whether an alien meets the hardship requirement in 8 U.S.C. § 1229b is . . . a discretionary judgment," we lack jurisdiction to review such a decision. *Mendez-Moranchel v. Ashcroft*, 338 F.3d 176, 179 (3d Cir. 2003). In the government's view, Pareja's attack on the legal underpinnings of *Monreal* is in reality an attack on the BIA's discretionary weighing of her evidence. That view is misguided.

While the government is certainly correct that we may not rehash the BIA's hardship calculation, the government mischaracterizes Pareja's attack on *Monreal*. Pareja does not contend that the BIA gave short shrift to her evidence or failed

11

to adequately account for the hardship she alleges Joanne would suffer in the event of removal. Instead, Pareja is challenging the legal standard the BIA uses to determine if an alien in her circumstances has demonstrated eligibility for cancellation of removal. Significantly, that challenge requires an analysis of *Monreal*'s interpretation of a congressional act and, by extension, of that act itself. Accordingly, Pareja's challenge is clearly a legal question. *Cf. Avendano-Espejo v. Dep't of Homeland Sec.*, 448 F.3d 503, 505 (2d Cir. 2006) (per curiam) ("[*A*]*bsent a specific issue of statutory construction*, the term 'questions of law' in 8 U.S.C. § 1252(a)(2)(D) does not provide our Court with jurisdiction to review a petitioner's challenge to a decision firmly committed by statute to the discretion of the Attorney General." (emphasis added and quotation marks and citations omitted)). It is just as clearly "colorable" because it relates solely to the nondiscretionary question whether the BIA's binding legal standards are correct. *Cf. Martinez-Rosas v. Gonzales*, 424 F.3d 926, 930 (9th Cir. 2005) ("[T]he alleged violation need not be substantial, but the claim must have some possible validity." (quotation marks and citation omitted)); *see, e.g., Khan v. Gonzales*, 495 F.3d 31, 35 (2d Cir. 2007) ("[D]espite the fact that Khan's legal argument is without merit, because Khan raises a 'question of law,' we conclude that we have jurisdiction to review his claim."). As such, Pareja's challenge in this respect falls neatly within this Court's "narrowly circumscribed" jurisdiction under 8 U.S.C. § 1252(a)(2)(D).

> **2. Whether the BIA erred by attaching weight to the number of qualifying relatives in its hardship determination**

12

The second issue Pareja submits for our review relates to the distinction the BIA drew between her case and its decision in *Matter of Recinas*. As noted, § 1229b(b)(1)(D) provides that an alien's eligibility for cancellation of removal depends in part on whether she establishes hardship to her "spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1)(D). In its decision, the BIA reasoned that, whereas Pareja had only one qualifying relative (Joanne), the alien in its decision in *Matter of Recinas* had four such relatives. Pareja argues that because § 1229b(b)(1)(D) refers to only one qualifying relative, the BIA erred in measuring her hardship showing by reference to the number of her qualifying relatives.

While a hardship determination under § 1229b(b)(1)(D), like the ultimate decision to grant or deny cancellation of removal, is discretionary and therefore beyond our jurisdictional purview, *see Mendez-Moranchel*, 338 F.3d at 179, where the BIA is alleged to have made a hardship determination based on "an erroneous legal standard" or "on fact-finding which is flawed by an error of law," *Mendez v. Holder*, 566 F.3d 316, 322 (2d Cir. 2009) (per curiam) (internal quotation marks and citation omitted), our jurisdiction to review that determination is secure. That is precisely the nature of Pareja's claim. She posits that the BIA misinterpreted the language of § 1229b(b)(1)(D) itself, not that the BIA misapplied that provision to the facts of her case. We therefore have jurisdiction to review this claim, as it clearly raises a colorable question of law. *Cf. Gomez-Perez v. Holder*, 569 F.3d 370, 372-73 (8th Cir. 2009) (court had jurisdiction where alien argued that the BIA "applied an incorrect legal standard by focusing on the present

13

circumstances of his children rather than on the future hardships that they would face if he were removed" because that argument raised a question of law); *Figueroa v. Mukasey*, 543 F.3d 487, 492, 495-96 (9th Cir. 2008) (jurisdiction existed to review alien's claim that the IJ applied incorrect legal standard "by considering only the hardship currently suffered by the children . . . without considering the hardship the children would suffer in the event that their parents were removed"); *Mireles v. Gonzales*, 433 F.3d 965, 969 (7th Cir. 2006) (court had jurisdiction over argument "that the immigration judge made a legal error in understanding the meaning of 'exceptional and extremely unusual hardship'").

> **3.      Whether the BIA erroneously made a hardship determination on the assumption that Joanne would return to Mexico with her mother**

Pareja's third argument is that the BIA "evaluated the level of hardship to Joanne based upon the assumption that she would return to Mexico with her mother, rather than the assumption that Joanne would remain in the United States . . . ." (Pet'r's Br. 50.)  Pareja contends that we have jurisdiction to review this argument because, in her view, it implicates a constitutional question. Specifically, she asserts, relying on pre-IIRIRA Sixth Circuit case law, that the BIA improperly failed to account for the hardship Joanne would suffer if she were forced to relinquish what Pareja characterizes as her daughter's constitutional right, as a United States citizen, to stay in this country.  We are unconvinced.

14

As a preliminary matter, Pareja's assertion that the BIA "assumed" that Joanne would return with her to Mexico instead of staying in the United States is wholly undermined by the record. Pareja herself affirmatively represented in sworn testimony before the IJ that her daughter would leave with her in the event of removal. (*E.g.*, App. 160 (answering "Yes" to the question, "If you had to return to Mexico, would your daughter go with you?").) Her employer, Mrs. Sheehy, said the same thing in the affidavit she submitted to the IJ on Pareja's behalf. (App. 270 ("If [Pareja] is sent back to Mexico, Joanne will most definitely go with her.").) In light of this evidence, the BIA did not, as Pareja maintains, "presum[e] [the] exile of an American citizen . . . ." (Pet'r's Br. 54.) Rather, based on Pareja's own sworn representations, the BIA concluded that it did not need to address Pareja's "arguments that assume [that her] removal would result in her separation from Joanne." (App. 3.) We see no error in the BIA's having taken Pareja at her word, especially when the record contains no evidence contradicting her testimony.[4]

---

[4]Although Pareja suggests that, even if she returns to Mexico, Joanne could hypothetically stay in the United States, never in these proceedings, including in her petition for review, has Pareja refuted her own testimony that Joanne would in fact return to Mexico with her in the event of removal. Furthermore, because Pareja told the BIA in no uncertain terms – and in uncontroverted testimony – that Joanne would accompany her to Mexico, we need not resolve her related claim that § 1229b(b)(1)(D) imposes a presumption that an alien's United States citizen child will remain in the United States if her alien

15

Furthermore, Pareja's reliance on the so-called doctrine of unconstitutional conditions is misplaced. In basic terms, that doctrine prohibits the government from conditioning the discretionary grant of a benefit on an individual's waiver of a constitutional right. *See Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *Frost & Frost Trucking Co. v. Railroad Com. of Cal.*, 271 U.S. 583, 593-94 (1926). Even assuming that that doctrine applies here and that Joanne has a constitutional right to stay in the United States – and we express no view on either point – our precedent makes plain that the BIA's order of removal as to her mother would not infringe on any such right. *See Acosta v. Gaffney*, 558 F.2d 1153, 1158 (3d Cir. 1977) (rejecting a claim that a minor United States citizen's constitutional right to stay in this country was violated by her alien parents' deportation because "her return to Colombia with her parents, if they decide to take her with them as doubtless they will, will merely postpone, but not bar, her residence in the United States if she should ultimately choose to live here"); *see also Gallanosa v. United States*, 785 F.2d 116, 120 (4th Cir.

---

parent is removed. We note, at any rate, that the statute speaks only in terms of "exceptional and extremely unusual hardship" to the qualifying relative; the statute's plain language nowhere intimates the presumption that Pareja urges. We do not necessarily foreclose the possibility that an alien could press the argument Pareja seeks to advance here if the BIA discounted the hardship to an alien's United States citizen child based on pure speculation that the child would leave the country with her alien parent. Significantly, that circumstance is not attendant in this case.

16

1986) ("The courts of appeals . . . have uniformly held that deportation of the alien parents does not violate any constitutional rights of the citizen children." (collecting cases)); *Schleiffer v. Meyers*, 644 F.2d 656, 662-63 & n.8 (7th Cir. 1981) (same).

Accordingly, this issue does not raise a colorable legal question, and we therefore lack jurisdiction to consider it.

### 4. Whether *Mendez-Moranchel v. Ashcroft* should be overruled

Finally, Pareja argues that we should overrule our decision in *Mendez-Moranchel v. Ashcroft*, 338 F.3d at 178-79, where we held that the BIA's determination of whether an alien has met the "exceptional and extremely unusual hardship" standard in the cancellation of removal statute is discretionary and therefore beyond our jurisdictional mandate. Pareja concedes that she advances this argument only to preserve it for en banc or Supreme Court review. Put another way, she acknowledges that we cannot grant her the relief she requests. Indeed, this panel cannot overturn a prior panel's precedential opinion. Third Circuit Internal Operating Procedure 9.1; *see Mariana v. Fisher*, 338 F.3d 189, 201 (3d Cir. 2003). As such, while this claim may properly be described as legal, it is not colorable because it is either "made solely for the purpose of obtaining jurisdiction," *Arbaugh*, 546 U.S. at 513 n.10, or has no "possible validity," *Martinez-Rosas*, 424 F.3d at 930 (quotation

17

marks and citation omitted), and therefore lies outside our jurisdictional bounds.[5]

**C.     Merits**

Having determined that we have jurisdiction over two of the issues Pareja has submitted for our review, we now turn to the merits of those issues.

**1.      Whether *Matter of Monreal* should be overruled**

Pareja urges us to "overrule" the BIA's en banc decision in *Matter of Monreal* based on its adoption of what Pareja characterizes as an erroneous interpretation of the "exceptional and extremely unusual hardship" standard.

_____

[5]It bears mentioning that *Mendez-Moranchel* is fully consonant with other circuits' case law on the question of an appellate court's jurisdiction to review the BIA's discretionary hardship determination. *See*, *e.g.*, *De Lourdes Castro De Mercado v. Mukasey*, 566 F.3d 813, 815 (9th Cir. 2009); *Martinez v. Att'y Gen. of the United States*, 446 F.3d 1219, 1221-22 (11th Cir. 2006); *Meraz-Reyes v. Gonzales*, 436 F.3d 842, 843 (8th Cir. 2006); *De La Vega v. Gonzales*, 436 F.3d 141, 145-46 (2d Cir. 2006); *Mireles v. Gonzales*, 433 F.3d 965, 968-69 (7th Cir. 2006); *Rueda v. Ashcroft*, 380 F.3d 831, 831 (5th Cir. 2004) (per curiam).

In *Matter of Monreal*, the BIA addressed the meaning of the "exceptional and extremely unusual hardship" standard in IIRIRA. The BIA began its analysis by comparing that standard to the "extreme hardship" standard in the pre-IIRIRA law. The BIA stated that it was "aware of the general rule that when 'Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.'" *Monreal*, 23 I. & N. Dec. at 59 (quoting *Lorillard v. Pons*, 434 U.S. 575, 581 (1978)) (other citation omitted). The BIA decided not to apply that presumption to IIRIRA on the ground that, while the "exceptional and extremely unusual hardship" phrase was included in the INA of 1952, only that phrase, as opposed to a section of prior law, had been imported into IIRIRA. Therefore, the BIA studied how that phrase had been interpreted before IIRIRA's enactment. The BIA noted that, under the 1952 law, that phrase applied to all applicants – not just their qualifying relatives – and that the legislative history evinced congressional intent to extend suspension of deportation only in "unconscionable" cases. The BIA declined to apply such a high standard to cancellation of removal, however, on the ground that, among other things, there was nothing in IIRIRA's legislative history to support the application of such a standard. The BIA was also unpersuaded by the interpretation of the phrase in cases from 1953 to 1957, before the INA was amended in 1962, reasoning that "th[is] case law cover[ed] only that period of time when the 'exceptional and extremely unusual hardship' standard was applied to all applicants for suspension of deportation, predating the period during which the standard was required principally for criminal aliens," and that "in many

19

of these cases the focus was on hardship to the alien, a hardship element that cannot even be considered under the present statute." *Id.* at 61 (citations omitted). Finally, the BIA pointed out that "this case law arose in a different overall statutory context and obviously significantly predated the decades of interpretation of the 'extreme hardship' standard that culminated in" the 1996 amendments. *Id.*

In view of these considerations, the BIA held that "although both the relevant legislative history from the 1952 Act and the old case law . . . provide an historical context for evaluating the 'exceptional and extremely unusual hardship' standard in applications for cancellation of removal, our principal focus is on the statutory language itself and the legislative history of the revisions that were enacted in 1996." *Id.* at 62. Using dictionary definitions to understand and to distinguish the old and the new standards, the BIA concluded that "[t]he [exceptional and extremely unusual hardship] standard requires a showing of hardship beyond that which has historically been required in suspension of deportation cases involving the 'extreme hardship' standard." *Id.*[6]

---

[6]After determining that the new phrase required a heightened showing by aliens seeking cancellation of removal, the BIA examined what specific factors it would consider to determine if an alien's showing was sufficient. The BIA saw no reason to abandon the factors it had consistently considered under the suspension of deportation statute's "extreme hardship" standard, but reasoned that it would weigh those factors "according to the higher standard required for cancellation of

BIA Member Rosenberg concurred in part and dissented in part. While she agreed with the majority that the plain language of the "exceptional and extremely unusual hardship" standard suggested "some type of difficulty or burden that is uncommon, rare, or different from the norm," *id.* at 66 (Rosenberg, Board Member, concurring and dissenting), Member Rosenberg disagreed with the majority's decision not to interpret that phrase in line with BIA precedents from the 1950s. Unlike the majority, she saw no basis for departing from the rule announced in *Lorillard v. Pons* "merely because Congress adopted only a phrase and not a whole section of prior

---

removal." *Monreal*, 23 I. & N. Dec. at 63. The BIA resolved to exclude from consideration any factors related to the alien herself, as the new statute made clear that only hardship to the qualifying relative, as opposed to the alien herself, could be considered. Thus, the BIA listed the following factors to be considered in determining whether an alien has adequately shown hardship to a qualifying relative: "the ages, health, and circumstances of qualifying lawful permanent resident[s] and United States citizen relatives." *Id.* The BIA also said that it would take into account, for example, a qualifying child's health problems or compelling school needs, as well as living conditions in the country of return. In the end, the BIA wrote, no one factor would be dispositive. Instead, "all hardship factors should be considered in the aggregate when assessing exceptional and extremely unusual hardship." *Id.* at 64 (citation omitted). Although Pareja discusses these factors in passing in her brief, we do not understand her specifically to fault the BIA's enumeration or qualification of these factors.

21

law." *Id.* (Rosenberg, Board Member, concurring and dissenting) (citations omitted). In her view, because the 1996 amendments reflected Congress's awareness of the case law interpreting the old hardship standard, the majority's rejection of that case law was inappropriate.

We ordinarily exercise plenary review over the BIA's legal determinations. *See*, *e.g.*, *Yusupov v. Att'y Gen. of the United States*, 518 F.3d 185, 197 (3d Cir. 2008). However, where, as here, "we are called upon to interpret a statute that is within the scope of an agency's rulemaking and lawmaking authority, our inquiry implicates the principles set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Lin-Zheng v. Att'y Gen. of the United States*, 557 F.3d 147, 155 (3d Cir. 2009) (en banc) (citation omitted). "*Chevron* deference is required when an agency construes or interprets a statute that it administers and the agency's interpretation is based on a permissible interpretation of the statute." *Mehboob v. Att'y Gen. of the United States*, 549 F.3d 272, 275 (3d Cir. 2008) (internal quotation marks and citation omitted).

"*Chevron* deference involves a two-step inquiry." *Yusupov*, 518 F.3d at 197. "[T]he court asks first if the statute is silent or ambiguous with respect to the specific issue of law in the case, using traditional tools of statutory construction to determine whether Congress had an intention on the precise question at issue." *Augustin v. Att'y Gen. of the United States*, 520 F.3d 264, 268 (3d Cir. 2008) (internal quotation marks, alteration and citation omitted). If the answer is affirmative, "the inquiry ends, as both the agency and the court must give

22

effect to the plain language of the statute." *Yusupov*, 518 F.3d at 197 (citation omitted). However, "[i]f Congress's intention is not evident, the court moves to the second step, where the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Augustin*, 520 F.3d at 268 (internal quotation marks, other alteration and citation omitted). "When Congress has left a gap in a statute, implicitly leaving the administering agency responsible for filling that gap, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* (internal quotation marks and citation omitted).

We begin with *Chevron* step one. "A basic tenet of statutory construction is that we must begin with the assumption that the ordinary meaning of statutory language accurately expresses the legislative purpose." *Lin-Zheng*, 557 F.3d at 155-56 (internal quotation marks, alterations and citations omitted). As the BIA recognized, the INA does not define "exceptional and extremely unusual hardship," and we think it beyond peradventure that reasonable people could differ on the meaning of that phrase. *Cf. INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981) (per curiam) (concluding that the "extreme hardship" standard under the pre-IIRIRA version of the INA was ambiguous because "[t]hese words are not self-explanatory, and reasonable men could easily differ as to their construction"); *Hernandez-Patino v. INS*, 831 F.2d 750, 753 (7th Cir. 1987) ("Congress, in refusing to define 'extreme' hardship fully, avoided the substantive policy decision and has deferred to agency expertise."); *Matter of Hwang*, 10 I. & N. Dec. 448, 451 (BIA 1964) (interpreting "extreme hardship" and finding that

23

"[t]he personal privation contemplated in a situation characterized by 'extreme hardship' within the meaning of the statute is not a definable term of fixed and inflexible content or meaning"). Given that ambiguity, we turn to the second step of the *Chevron* analysis. *See Augustin*, 520 F.3d at 269.

At *Chevron* step two, we ask whether the BIA's interpretation is permissible. The BIA's interpretation is permissible if it is a "reasonable interpretation" of the relevant statute. *Chevron*, 467 U.S. at 844. As noted, the BIA began its analysis by remarking that the "exceptional and extremely unusual hardship" standard was susceptible to different meanings. That ambiguity notwithstanding, the BIA determined, based on the plain language of the phrase as a whole, that "the hardship standard for cancellation of removal is a higher one than that under the suspension of deportation," *Monreal*, 23 I. & N. Dec. at 59 (citations omitted), specifying that the new standard requires an alien to demonstrate hardship to a qualifying relative that is "'substantially' beyond the ordinary hardship that would be expected when a close family member leaves this country," *id.* at 62. We see nothing unreasonable in that determination, as it is practically compelled by a simple juxtaposition of the two phrases themselves. Based on their plain language, no great intellectual leap is required to realize that "exceptional and extremely unusual hardship" requires a greater showing than "extreme hardship." *Cf. Cortes-Castillo v. INS*, 997 F.2d 1199, 1204 (7th Cir. 1993) ("Relief under the 'exceptional and extremely unusual hardship' standard of section [1254(a)(2)] is even more restrictive than the 'extreme hardship' requirement of section [1254(a)(1)]." (footnote and citation omitted)); *see Pimentel v. Mukasey*, 530

24

F.3d 321, 324 (5th Cir. 2008) (per curiam) (noting that the new phrase imposes a heightened requirement); *Moreno-Morante v. Gonzales*, 490 F.3d 1172, 1177-78 (9th Cir. 2007) (noting that Congress's substitution of "extreme hardship" with "exceptional and extremely unusual hardship" was "prompted by a weakening of the 'suspension of deportation' requirements"); *Ramirez-Perez v. Ashcroft*, 336 F.3d 1001, 1006 (9th Cir. 2003) (similar). Accordingly, we perceive no basis for concluding, based on IIRIRA's plain language, that the BIA's interpretation falls outside the broad range of permissible interpretations authorized by the statutory language.

Furthermore, as the BIA correctly recognized in *Monreal*, its interpretation is buttressed by IIRIRA's legislative history. *Cf. Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703-04 (1995) (court's conclusion that agency's statutory interpretation was permissible found "further support from the legislative history of the statute"); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) ("An agency's construction of a statute . . . is entitled to deference if it is reasonable . . . in light of the language, policies, *and legislative history . . . .*" (emphasis added)). In enacting IIRIRA, Congress explicitly noted that the impetus for the new law was what was perceived as the watering-down of the suspension of deportation statute via administrative decisions:

> The managers have deliberately changed the required showing of hardship from "extreme hardship" to "exceptional and extremely unusual hardship" to emphasize that the alien must provide evidence of harm to his spouse, parent, or

25

child substantially beyond that which ordinarily would be expected to result from the alien's deportation. The "extreme hardship" standard has been weakened by recent administrative decisions. . . . Our immigration law and policy clearly provide that an alien parent may not derive immigration benefits through his or her child who is a United States citizen. The availability in truly exceptional cases of relief under [the cancellation of removal statute] must not undermine this or other fundamental immigration enforcement policies.

H.R. Rep. No. 104-828, at 213-14 (1996).

Given IIRIRA's plain language and legislative history, there is no basis for concluding that the BIA's interpretation of the "exceptional and extremely unusual hardship" standard is anything other than "a permissible construction of the statute." *See Chevron*, 467 U.S. at 843-44 & n.11.[7] As a consequence,

---

[7]Pareja's main assignment of error essentially parrots the *Monreal* dissent. According to Pareja, "[t]he BIA's disregard of the *Lorillard* canon of statutory construction does not represent a reasonable interpretation of the [cancellation] statute, and thus is not protected by the deference ordinarily given the BIA in interpreting the immigration laws." (Pet'r's Br. 28-29.) In *Lorillard*, the Supreme Court explained that

Congress is presumed to be aware of an

26

administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change. . . . So too, where . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.

434 U.S. at 580-81.

Based on *Lorillard*, Pareja argues that the BIA was obligated to interpret the "exceptional and extremely unusual hardship" standard by reference to case law from the 1950s. Taken out of context, the language in *Lorillard* that Pareja spotlights arguably supports her cause. On closer inspection, however, Pareja's position loses traction for three interrelated reasons. First, the *Lorillard* canon applies only "when judicial interpretations have settled the meaning of an existing statutory provision . . . ." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (internal quotation marks and citations omitted). In such a case, "repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." *Id.* (quotation marks, ellipsis and citations omitted). As *Monreal* recognized, and as Pareja does not dispute, the case law interpreting "exceptional and extremely unusual hardship" under the 1952 version of the INA spans only about one decade and settled very little. Indeed, Pareja concedes that those early cases

27

"never reduced their interpretation of 'exceptional and extremely unusual hardship' to a precise verbal formula that one could substitute for that phrase without losing meaning." (Pet'r's Br. 30.) Clearly, if the 1950s decisions did not decisively delineate the contours of that phrase, it cannot be seriously argued that the interpretation of that phrase was so settled that we should expect Congress to have been on notice of its meaning some thirty years later. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 532 (1994) (declining to apply *Lorillard* because "[o]ur review of the prior case law itself leads us to conclude that there was no settled . . . interpretation . . . about which Congress could have been aware").

Second, as *Lorillard* makes plain, the presumption that Congress is aware of settled interpretations of a law ordinarily arises where Congress "re-enacts" the same law. *See*, *e.g.*, *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8 (1975). Importantly, here, Congress did not re-enact the same law. Instead, it enacted a new law that purposefully substituted the language of the old law with different language that happened to mirror the language of a law that had been defunct for several years. These circumstances do not compel the application of the *Lorillard* presumption. *See*, *e.g.*, *Nigg v. United States Postal Serv.*, 555 F.3d 781, 787 (9th Cir. 2009).

Finally, the rule in *Lorillard* "must always be qualified by the observation that evidence of what subsequent Congresses intend pales in comparison to probative evidence *about what the enacting Congress intended*." *Coke v. Long Island Care at*

we must defer to the BIA under *Chevron*. *See Mehboob*, 549 F.3d at 279; *Augustin*, 520 F.3d at 269-72; *Yusupov*, 518 F.3d at 200; *Briseno-Flores v. Att'y Gen. of the United States*, 492 F.3d 226, 231 (3d Cir. 2007). Accordingly, we will deny Pareja's petition insofar as it attacks *Matter of Monreal* and the BIA's interpretation of the cancellation of removal statute's hardship standard.[8]

---

*Home, Ltd.*, 376 F.3d 118, 130 n.4 (2d Cir. 2004) (emphasis added), *vacated and remanded on other grounds*, 546 U.S. 1147 (2006); *accord Henderson v. Shinseki*, 589 F.3d 1201, 1215 (Fed. Cir. 2009). As the BIA observed in *Monreal*, there is abundant evidence of what Congress actually intended when it enacted IIRIRA. As noted, Congress was concerned that administrative decisions had lowered the bar for determining what constitutes hardship to a qualifying relative and thus sought to impose a heavier burden on aliens. Under these circumstances, it was certainly permissible for the BIA to rely on an unequivocal statement of intent from the Congress that enacted IIRIRA. *See Harvey v. Johanns*, 494 F.3d 237, 243 (1st Cir. 2007) (rejecting reliance on *Lorillard* because "Congress – whatever its awareness of the regulations – was unarguably focused on ameliorating the effects of [a previous judicial] decision").

[8]Pareja also attacks the BIA's en banc decision in *Matter of Andazola*, where the BIA denied cancellation of removal to a single Mexican mother of two United States citizens based largely on the reasoning of *Monreal*. The BIA in *Andazola* was "sympathetic" to the alien's case, 23 I. & N. Dec. at 322, but

29

### 2. Whether the BIA erred by attaching weight to the number of qualifying relatives in its hardship determination

Pareja argues that the BIA found her ineligible for

pointed out that "Congress has now imposed a standard of hardship that is significantly more burdensome than the former 'extreme hardship' standard," *id.* The BIA found the alien's showing – which, like Pareja's, was limited to mostly economic detriment and lesser educational opportunities for her children – inadequate under "the very high standard of the current law." *Id.* Eight Members dissented, arguing that the alien should have prevailed based on her particular circumstances while recognizing that this was "a close case," *id.* at 329 (Osuna, Board Member, dissenting), and without calling into question the soundness of *Monreal*'s legal foundation. Pareja claims that in *Andazola* "[t]he BIA compounded the error of *Monreal*" by "double-count[ing] Congressional intent to narrow the class of eligible aliens, and in so doing exacerbated its unsound departure from the pre-IIRIRA precedents on the meaning of 'exceptional and extremely unusual hardship[.]'" (Pet'r's Br. 41-42.) Pareja's isolation of the BIA's statement that Congress, in the new cancellation of removal statute, "narrowed the class of aliens who could qualify for relief," *Andazola*, 23 I. & N. Dec. at 58, is for nought. That statement merely reflects the BIA's recognition – and accurate recognition at that – that Congress raised the bar for aliens in IIRIRA. To the extent Pareja's assault on *Andazola* mirrors her attack on *Monreal*, it fails for the same reasons we have already cited.

30

cancellation of removal based on an impermissible consideration in its hardship calculation. Specifically, she contends that the BIA incorrectly focused on the number of her qualifying relatives and not simply on the hardship to her sole qualifying relative in the event of removal.

This challenge is again governed by the *Chevron* analysis. Thus, we must first determine whether § 1229b(b)(1)(D) "is silent or ambiguous with respect to the specific issue of law in the case, using traditional tools of statutory construction to determine whether Congress had an intention on the precise question at issue." *Lin-Zheng*, 557 F.3d at 155 (quoting *Augustin*, 520 F.3d at 268) (quotation marks omitted). That provision says that cancellation of removal may be granted to an alien who "establishes that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1)(D). The statute is clearly written in the singular, and it speaks without equivocation: hardship may be established by reference to but one qualifying relative. There is nothing in § 1229b(b)(1)(D) to suggest that eligibility for cancellation of removal – as opposed to the discretionary grant or denial of cancellation of removal – is in any way a function of how many qualifying relatives an alien has. Because "congressional intent is clear, 'the [*Chevron*] inquiry ends, as both the agency and [we] must give effect to the plain language of the statute.'" *Lin-Zheng*, 557 F.3d at 155 (quoting *Yusupov*, 518 F.3d at 197). Under the statute, then, whether Joanne was Pareja's only qualifying relative or one of several would not have been a proper focus of inquiry for the purpose of

31

determining Pareja's eligibility for cancellation of removal. *Cf.*
*Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 305 (2d
Cir. 2007) (en banc) (finding that the phrase "a person who has
been forced to abort a pregnancy or to undergo involuntary
sterilization" in 8 U.S.C. § 1101(a)(42) "could not be more clear
in its reference to 'a person,' rather than 'a couple,' who has
been subjected to a forced abortion or involuntary sterilization"),
*cited with approval in Lin-Zheng*, 557 F.3d at 156.

Here, the BIA began its analysis by determining that
Pareja's only qualifying relative was Joanne. Having
determined as much, the BIA turned its attention to whether
Pareja had met her burden of showing hardship to Joanne. The
BIA rejected Pareja's claim that Joanne had serious emotional
problems or compelling educational needs, pointing to a lack of
evidence. The BIA also cited Pareja's testimony that Joanne
would return to Mexico with her, concluding that Joanne's
alleged separation anxiety was not a relevant consideration in
light of that testimony. The BIA further noted that Pareja had
some savings that would enable her to gain a footing in Mexico
with Joanne, and that Pareja had failed to establish that Joanne's
father would cease making child support payments or seeing his
daughter if she returned to Mexico. Significantly, none of these
considerations reflect that the BIA impermissibly concentrated
on the number of Pareja's qualifying relatives. The portion of
the BIA's decision on which Pareja principally trains her sights
is its discussion of *Matter of Recinas*. In that discussion, the
BIA sought to distinguish *Recinas* from Pareja's case. The BIA
noted that the *Recinas* petitioner "was the sole supporter of six
children, . . . [and] had no support from her children's father

32

. . . ." (App. 4.) "By contrast," the BIA reasoned, Pareja "has one qualifying relative . . . ." (*Id.*)

We agree with Pareja that the BIA's apparent basis for differentiating her case from *Recinas* is potentially problematic, as it suggests that the BIA may have given weight to an impermissible factor under § 1229b(b)(1)(D). In our view, the BIA's discussion of *Recinas* is susceptible to at least two broad interpretations. On the one hand, by citing how many qualifying relatives the *Recinas* petitioner had, the BIA simply might have meant that the *Recinas* petitioner had established hardship to each individual qualifying relative because her resources necessarily would have been spread more thinly than Pareja's, as Pareja is financially responsible for only one individual, Joanne. This approach would have been permissible under § 1229b(b)(1)(D). On the other hand, the BIA's decision also could be read to mean that the BIA thought *Recinas* was distinguishable on the ground that Pareja did not have as many qualifying relatives as the *Recinas* petitioner. If this reading accurately reflects the BIA's mode of analysis, the BIA committed legal error. Of course, there may well be other explanations for the BIA's treatment of *Recinas*.

Given our uncertainty over the meaning of the BIA's decision in this sole respect and what appears to us as more than just a remote possibility that the BIA failed to implement congressional intent by requiring Pareja to establish hardship by reference to a consideration not contemplated by § 1229b(b)(1)(D), we believe the prudent course is to grant Pareja's petition in part and remand this case for the limited purpose of allowing the BIA either to clarify its decision or, in

33

the event the BIA determines that it made a mistake in its application of *Recinas* to Pareja's case, to decide anew based on the current record whether Pareja has established eligibility for cancellation of removal using the proper hardship standard.[9]

_____

[9]Judge Greenberg joins in Judge Fisher's comprehensive opinion in all respects but points out that regardless of whether or not there was a mistake in the application of *Recinas* in this case, and regardless of the number of children impacted by the denial of an application for cancellation of removal, the overarching consideration here is whether the alien's removal, in this case Pareja, would result in "exceptional and extremely unusual hardship to" the parent's child, in this case Joanne. Judge Greenberg is tempted to say that we should deny the petition for review because no matter what the BIA concludes on remand, the hardship here, though undoubtedly severe, simply cannot be considered to be "exceptional and extremely unusual" whether or not Joanne accompanies her mother to Mexico when her mother either departs voluntarily or is removed. Yet Judge Greenberg recognizes that there are intricate jurisdictional questions involved in these appellate proceedings and, in the circumstances, we are taking a wise path in remanding as the opinion provides. He wants to emphasize, however, that by remanding we are not implying that we have a positive view of the merits on the overarching question in this case, i.e. would the hardship to Joanne from her mother's removal be "exceptional and extremely unusual."

34

## III.

For the foregoing reasons, we will grant Pareja's petition to the extent it relates to the BIA's consideration of the number of her qualifying relatives, and remand this case to the BIA for the limited purpose of allowing it to clarify or to reconsider its application of *Matter of Recinas* to this case. We will deny Pareja's petition to the extent it asks us to overrule *Matter of Monreal*. Finally, we will dismiss the balance of the petition for lack of jurisdiction.